The CURTIS MANAGEMENT GROUP, INC., and the James Dean Foundation Trust, Plaintiffs,

v.

ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, and Bruce McGaw Graphics, Inc., Defendants.

No. IP88–1130–C.

United States District Court, S.D. Indiana, Indianapolis Division.

July 13, 1989.

Gene R. Leeuw and Dean T. Barnhard, Klineman Rose Wolf & Wallack, Indianapolis, Ind., for plaintiffs.

Joe C. Emerson and John B. Swarbrick, Jr., Baker & Daniels, Indianapolis, Ind., and John B. Quinn and David W. Quinto, Quinn & Emanuel, Los Angeles, Cal., for

defendant Academy of Motion Picture Arts and Sciences.

## ORDER ON DEFENDANT'S MOTION TO DISMISS OR TRANSFER

McKINNEY, District Judge.

This diversity and trademark infringement action comes before the Court on the motion to dismiss for lack of personal jurisdiction and improper venue filed by defendant Academy of Motion Picture Arts. Alternatively, defendant seeks to have this cause transferred to the United States District Court for the Central District of California. On March 8, 1989, this Court entered an Order holding in abeyance the motions pending expedited discovery. The Court found this to be a close case and chose to have the benefit of further evidence before ruling.

The parties have since conducted limited discovery. After reviewing the law on the stream of commerce theory in minimum contacts analysis, the Court finds that there is insufficient evidence concerning the Academy's knowledge of the distribution system. Further, there is no showing that venue over the claim against the Academy is proper in this district.

However, because the Academy, through its agents, has engaged in sanctionable conduct in the defense of this lawsuit before this Court, the Court finds that the Academy must be sanctioned. The Court finds the appropriate sanction to be the striking of the Academy's motion to dismiss for want of personal jurisdiction, notwithstanding the fact that personal jurisdiction and proper venue has not otherwise been shown to exist. The Court thus STRIKES the Academy's motion to dismiss.

### I. *Facts and Burden of Proof*

■ To determine whether the exercise of personal jurisdiction is proper, a court may receive and consider affidavits and other documentary evidence. *Nelson by Carson v. Park Industries, Inc.,* 717 F.2d 1120, 1123 (7th Cir.1983). "During this preliminary proceeding, although the burden of proof rests on the party asserting jurisdiction, if the district court's decision is based on the submission of written materials the burden of proof is met by a prima facie showing that personal jurisdiction [exists]...." *Id.; Nieman v. Rudolf Wolff & Co., Ltd.,* 619 F.2d 1189, 1191 (7th Cir. 1980), *cert. denied,* 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148.

"In addition, [the plaintiff] is entitled not only to the acceptance of all undenied factual assertions in his submissions, but also to the resolution in his favor of all disputes about relevant facts." *Neiman,* 619 F.2d at 1190; *Park Industries,* 717 F.2d at 1123; *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.,* 726 F.2d 1209, 1215 (7th Cir.1984) ("all conflicts in the affidavits ... must be resolved in favor of the plaintiff"); *International Steel Co. v. Charter Builders, Inc.,* 585 F.Supp. 816, 819 (S.D.Ind.1984) ("any affidavits or other specific evidence of the nonmoving party must be assumed to be true" in resolving a personal jurisdiction issue).

■ Where, as here, some of the facts are in dispute, this Court must follow the rules set forth above and resolve the conflict in favor of the plaintiff. Based on these standards and the parties submissions, the Court finds the following facts for purposes of this motion:

James Dean, an Indiana native who was a famous actor and film star, died in 1955 in a car accident. Since his death, his popularity has continued and his name and likeness are recognized by many. As a result of this popularity, rights of substantial economic and commercial value have attached to his name and likeness.

On June 3, 1984, the heirs of James Dean established the James Dean Trust, a plaintiff in this action. The James Dean Trust is a trust established in Indiana with its principal place of business in Indianapolis. The Trust has obtained a number of federally registered trademarks to James Dean's name and likeness.

The Trust hired the Curtis Management Group, the other named plaintiff in this case, to act as its exclusive licensing agent for the purposes of licensing third parties to use the James Dean name and likeness

in commercial ventures. Curtis Management is an Indiana corporation with its principal place of business in Indianapolis.

The movant-defendant in this action is the Academy of Motion Picture Arts and Sciences, a California corporation with its principal place of business in Beverly Hills, California. The Academy does not have any offices or employees in Indiana, nor does it own property in Indiana. The Academy is a nonprofit entity that supports its services through, among other things, the sale of fourteen different posters, including one of James Dean (the "Dean Poster"). The Dean Poster contains an enlargement of a still photograph of James Dean taken during the filming of "Giant" in 1955. The Dean Poster has been sold at a price ranging from $5.00 to $45.00 with shipping and handling. In 1988, the Academy's poster sales totalled $19,751, accounting for fifteen percent of the Academy's total revenues.

The plaintiff has come forth with evidence that in August of 1988, an Indianapolis resident by the name of Mary Beth Vahle, an employee of plaintiff Curtis Management, wrote the Academy in California seeking to purchase a Dean Poster. Ms. Vahle received the poster through the mail in Indiana some time later.

On February 4, 1989, Mark Roesler, the president of Curtis Management, visited a poster store in the north Shadeland area of Indianapolis and was shown a catalog of prints that were available for sale and framing. One of the posters in the catalog was the James Dean poster produced by the Academy. The Dean poster is also available through the same catalog at all three Great Frame–Up shops in Indianapolis.

Subsequently, on February 6th Ms. Carolyn J. Phillips visited two Deck–the–Walls stores in Indianapolis. At each store the Dean poster was offered for sale through a catalog of prints. Both stores had a Dean poster in stock and displayed for sale, and Ms. Phillips purchased one of the Dean posters over the counter at each store. On February 9th and 10th of 1988, Ms. Phillips visited several retail poster stores in Indianapolis, Bloomington, and Terre Haute, Indiana. A salesperson at each of the stores showed Ms. Phillips catalogs of prints. The Dean Poster in question was displayed in a catalog at each store. A salesperson at each store offered to order the poster for Ms. Phillips. Ms. Phillips ordered the Dean Poster through 3 such stores, paying $25.00 for the print and approximately $20.00 for shipping in each instance. Ms. Phillips received the 3 posters within several weeks of ordering. On February 7, 1989, Marcus Winslow purchased a Dean poster over the counter from a poster and framing shop in Anderson, Indiana.

A company named Photo and Graphic Arts sells the poster in Venice, California. Photo and Graphic Arts represents that it has neither advertised nor sold the Dean poster in Indiana, although it admits that it did send a catalog (of an unspecified nature) to someone in Indiana in December, 1987.

The catalog through which the Dean poster is offered for sale is distributed by defendant Bruce McGaw Graphics of New York. McGaw Graphics is a wholesaler/distributor of posters and lithographs. The catalog is located in dozens of identified poster stores in the Southern District of Indiana. The Academy has sold the Dean poster in significant quantities to Bruce McGaw Graphics on a systematic, continuous basis for several years. The Academy made the following sales of its posters to McGaw over a three-year period, with the price reflecting a 10% discount that the Academy gave to McGaw on most purchases:

| Date: | Dean posters: | | Other posters: | |
|---|---|---|---|---|
| | (# sold) | (Revenue): | (# sold) | (Revenue): |
| 10/24/85 | 40 | $225.00 | 25 | $ 140.63 |
| 11/12/85 | 50 | $281.25 | | |
| 12/2/85 | 50 | $281.25 | | |
| 12/18/85 | | | 25 | $ 140.63 |
| 1/8/86 | 40 | $225.00 | | |
| 3/4/86 | 100 | $562.50 | 25 | $ 140.63 |
| 3/21/86 | | | 25 | $ 140.63 |
| 7/29/86 | 60 | $337.50 | | |
| 8/21/86 | | | 25 | $ 140.63 |
| 9/23/86 | 50 | $281.25 | | |
| 10/13/86 | | | 15 | $ 84.38 |
| 10/30/86 | | | 15 | $ 84.38 |
| 11/15/86 | 40 | $225.00 | | |
| 12/16/86 | 50 | $281.25 | 25 | $ 140.63 |
| 3/13/87 | 35 | $198.87 | 20 | $ 112.50 |
| 4/16/87 | 50 | $281.25 | | |
| 5/11/87 | | | 20 | $ 112.50 |

| Date: | Dean posters: | | Other posters: | |
|---|---|---|---|---|
| | (# sold): | (Revenue): | (# sold): | (Revenue): |
| 6/3/87 | | | 20 | $ 112.50 |
| 5/14/87 | 30 | $168.75 | | |
| 6/10/87 | 30 | $168.75 | | |
| 9/1/87 | | | 10 | $ 56.25 |
| 9/14/87 | | | 10 | $ 56.25 |
| 10/29/87 | 20 | $112.50 | 10 | $ 56.25 |
| 1/7/88 | | | 10 | $ 56.25 |
| 1/8/88 | | | 15 | $ 84.85 |
| 1/18/88 | 40 | $225.00 | 65 | $ 365.95 |
| 1/20/88 | 50 | 281.50 | 287 | $1,615.81 |
| 7/15/88 | 55 | $309.65 | 80 | $ 463.84 |
| 7/15/88 | 28 | $157.64 | 128 | $ 720.64 |
| 9/15/88 | | | 30 | $ 168.75 |
| 10/19/88 | 15 | $ 84.85 | | |

Thus, over a three year span, the Academy sold quantities of its posters to McGaw on over thirty occasions, with sales of the Dean poster being made on at least nineteen occasions. More than 1,600 total posters were sold, with over 800 of them being the Dean poster. Total revenues for all the posters sold to McGaw were approximately $10,000, with almost $5,000 of those sales being attributable to the Dean poster.[1]

Based on these facts, plaintiffs argue that by placing its product in the stream of commerce, the Academy has purposefully availed itself of the privileges and burdens of doing business in Indiana so as to be subject to suit here. The Academy disagrees, asserting that plaintiffs have only proven random and fortuitous contacts with this state. In order to address these arguments, the constitutional standards for personal jurisdiction must be examined.

## II. *Personal Jurisdiction—Minimum Contacts and Notions of Substantial Justice and Fair Play*

### A. General minimum contacts standards

A federal court must have personal jurisdiction over a defendant's person or property to entertain a suit against the defendant. 4 Wright and Miller, *Federal Practice and Procedure* § 1063 at 224 (2d ed. 1987). A federal court enjoys personal jurisdiction in a diversity case such as this only if a court of the forum state would have such jurisdiction. *Young v. Colgate Palmolive*, 790 F.2d 567, 569 (7th Cir.1986); *Nelson by Carson v. Park Industries*, 717 F.2d 1120,

1123 (7th Cir.1983). The determination of whether an Indiana court would have jurisdiction over a non-consenting, nonresident defendant is normally a two-step process. *Giotis v. Apollo of the Ozarks*, 800 F.2d 660, 665 (7th Cir.1986), *cert. den.* 479 U.S. 1092, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987).

The first question is whether the defendant is subject to jurisdiction under the applicable Indiana long-arm statute. If defendants are subject to the mechanical provisions of the statute, the second question of due process is reached. Where, as here, Indiana's long arm statute embodied in Indiana Rules of Trial Procedure 4.4 is intended to be coextensive with the full reach of the Due Process Clause, *Nu–Way Systems of Indianapolis, Inc. v. Belmont Marketing, Inc.*, 635 F.2d 617, 619 (7th Cir.1980), the first step is superfluous, and a court need only address the due process requirements. *Giotis*, 800 F.2d at 655; *Griese–Traylor Corp. v. Lemmons*, 424 N.E.2d 173, 180 (Ind.App.1981).

There are two different types of due process analysis in personal jurisdiction: general and specific. General jurisdiction allows a court to entertain a suit against a defendant because of the defendant's general presence in the forum state regardless of whether that presence is related to the litigation at hand. *See generally Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); 4 Wright, *Federal Practice* § 1067, at 296 ("[I]n order to assert general jurisdiction there must be substantial forum related activity on the part of the defendant."). Specific jurisdiction, on the other hand, is utilized where the defendant lacks a general presence in the state and where the only possible basis for haling the defendant into court stems from the contacts giving rise to the litigation. *See Wallace v. Herron*, 778 F.2d 391, 393 (7th Cir.1985); *Dollar Savings Bank v. First Security Bank of Utah*, 746 F.2d 208 (3d Cir.1984).

---

**1.** These figures are in sharp conflict with the prior affirmations of Mr. Bruce Davis of the Academy, who declared under oath on November 11, 1988, that the Academy "does not sell the Dean Poster other than to Photo and Graphic Arts or persons who contact the Academy to request copies," and who later declared on February 3, 1989, that the Academy sold only 61 Dean posters from September of 1985 through January of 1989.

In this case the evidence does not remotely suggest the existence of general jurisdiction. There are no facts pointing towards a continuous and systematic presence by the Academy in Indiana. Accordingly, the Court's discussion of personal jurisdiction over the defendants must focus on specific jurisdiction.

The Supreme Court has set forth and reiterated the general standards that govern this analysis in personal jurisdiction cases on a number of occasions. In *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), the Court explained that due process requires that a nonresident defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Deckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

The relationship among the defendant, the forum, and the litigation is the focus of the inquiry into specific personal jurisdiction. *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2581, 53 L.Ed.2d 683 (1977); *Wallace v. Herron*, 778 F.2d 391, 393 (7th Cir.1985). "[T]he defendant's conduct and connection with the forum state [must be] such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

"By requiring that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,' *Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring), the Due Process Clause 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will

not render them liable to suit' ...." *Burger King v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). Where a forum asserts specific jurisdiction over an out-of-state defendant who has not consented to suit there, "this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984), and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472, 105 S.Ct. at 2182. The purposeful availment require-. ment "ensures that a defendant will not be haled into a jurisdiction as a result of 'random,' 'fortuitous,' or 'attenuated' contacts...." *Id.* at 475, 105 S.Ct. at 2183.

**B. Minimum contacts refined—the "stream of commerce" theory**

Beyond these general standards of minimum contacts analysis, there are a line of cases in which the courts have grappled with the "stream of commerce" theory. Under this theory, the entry of a defendant's product into the forum is considered a sufficient minimum contact if the entry is part of a consistent pattern of multistate business such that it is reasonable to foresee the potential dispersion of the product into the forum. 4 Wright, *Federal Practice* § 1069 at 391–392. If, on the other hand, the defendant has patterned his business to avoid having its products reach a particular forum, but some nonetheless find their way their through fortuitous events, jurisdiction "seems more questionable." *Id.* at 393–394.

The Supreme Court spoke to this issue with some specificity in the *World–Wide Volkswagen* case. In that case, the plaintiff tried to assert jurisdiction in Oklahoma over a New York automobile wholesaler based on an accident that occurred in Oklahoma as the purchasers of the car drove through Oklahoma. 444 U.S. at 297–98, 100 S.Ct. at 567–68. The Court rejected the plaintiff's argument that mere foreseeability of a product finding its way into a forum state provided sufficient minimum contacts for jurisdiction. 444 U.S. at 295,

100 S.Ct. at 566. The Court reaffirmed that the mere unilateral activity of some third party, in that case the act of the purchasers in driving the car thousands of miles west after the purchase, could not satisfy the requirement of contact with the forum state. *Id.* at 298, 100 S.Ct. at 567.

The *World–Wide Volkswagen* Court, however, made it clear in dictum that the stream of commerce theory remained viable to manufacturers and distributors. The Court, after noting that foreseeability is not wholly irrelevant, explained that if the sale of a product "is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its products in other States, it is not unreasonable to subject it to suit in one of those States...." 444 U.S. at 297, 100 S.Ct. at 567. The Due Process Clause is not violated if a forum "asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 298, 100 S.Ct. at 567.

The Court next visited the stream of commerce theory in *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In *Asahi,* the Court considered whether the Constitution permitted a California court to assert jurisdiction over a Japanese firm that made tire valves, sold them to a tire company in Taiwan, which, in turn, installed them into tires sold in California. Although a majority of the Court found jurisdiction lacking because it would have been unreasonable to hale the Japanese defendant into California on an indemnification claim (fair play and substantial justice analysis), 480 U.S. at 113–116, 107 S.Ct. at 1033–34, the Court was divided on what the proper formulation of the stream of commerce/minimum contacts analysis should be. Contrary to the Academy's argument, the *Asahi* court did not state the test "under which a nonresident defendant can be held responsible

for the distribution process which brings a product into a forum." (Br. at 6).

Four justices, relying on the dictum of *World–Wide Volkswagen,* would have found minimum contacts sufficient under their stream of commerce approach. *Asahi,* 480 U.S. at 116–121, 107 S.Ct. at 1035–38 (Brennan, J. concurring in part and concurring in the judgment).[2] To them, the proper analysis is whether a participant in the distribution system is aware that the final product is being marketed in the forum state. They noted that "most courts and commentators have concluded that jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause, and have not required a showing of additional conduct." *Asahi,* 480 U.S. at 117, 107 S.Ct. at 1035 (collecting cases). Justice Stevens added that he "would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute 'purposeful availment' even though the item delivered to the forum State was a standard product marketed throughout the world." 480 U.S. at 121–22, 107 S.Ct. at 1038 (Stevens, J., concurring in part and concurring in the judgment).

On the other hand, Justices O'Connor, Rehnquist, Powell, and Scalia formulated a different stream of commerce theory. *Asahi,* 480 U.S. at 108–113, 107 S.Ct. at 1031–33. To them, the "placement of a product in the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.* at 112, 107 S.Ct. at 1033. Justice O'Connor explained their reasoning, writing, "Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales

---

**2.** Justices Brennan, White, Marshall, and Blackmun shared this view in their concurring opinion.

agent in the forum State." *Id.* "But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Id.*

Thus, *Asahi* left unanswered many questions about the stream of commerce theory. As one commentator has noted, the "Court's inability to gather a majority on either side of the minimum contacts issue in Asahi leaves the law in that area unsettled." *The Supreme Court, 1986 Term, Leading Cases,* 101 Harv.L.Rev. 260, 270 (1987); *see also Future Ways, Inc. v. Odiorne,* 697 F.Supp. 1339, 1343 (S.D.N.Y. 1988) (noting that stream of commerce theory is unsettled after *Asahi* ). Because the Supreme Court could not agree to a standard, and because the Seventh Circuit has not addressed this issue since the *Asahi* decision, this District Court must continue to apply the stream of commerce theory set forth in *World–Wide Volkswagen* and used in the Seventh Circuit in prior decisions. *Accord, Irving v. Owens–Corning Fiberglas Corp.,* 864 F.2d 383, 386 (5th Cir.1989) ("Because the Court's splintered view of minimum contacts in *Asahi* provides no clear guidance on this issue, we continue to [view minimum contacts analysis] by the stream of commerce standard as described in *World–Wide Volkswagen* and embraced in this circuit.").

Several decisions of the Seventh Circuit provide guidance on this issue. For instance, in *Honeywell, Inc. v. Metz Apparatewerke,* 509 F.2d 1137 (7th Cir.1975), the court addressed the stream of commerce analysis in a patent case. There the plaintiff/patent-holder was the Honeywell company of Illinois, while defendant Metz was a German business. In 1970 the parties began negotiating for the potential licensing of Metz' products under Honeywell's patent. After discussions broke off, Metz informed Honeywell that it was going to deliver its product to the United States anyway. Metz subsequently entered into an exclusive distributorship agreement with a U.S. company. 509 F.2d at 1139.

Honeywell then sued in an Illinois federal court for patent infringement.

The district court found personal jurisdiction lacking, but the Seventh Circuit reversed. The court reasoned that "Metz was not merely a foreign manufacturer which sold to various foreign exporters, knowing that the exporters would, in turn, sell to distributors throughout the world, including the United States." *Honeywell,* 509 F.2d at 1144. Rather, Metz first attempted to obtain a license from the Illinois corporation, and thereafter entered into an exclusive distributorship which resulted in infringing sales in Illinois. *Id.* The court wrote, "Metz may not have physically entered the state of Illinois, but it placed its flash devices in the stream of commerce under such circumstances that it should reasonably have anticipated that injury through infringement would occur there." *Id.* The court concluded, "We look to the economic and commercial realities of this case, and in our view, it is not within the contemplation of the concepts of fairness and due process to allow a wrongdoing manufacturer to insulate himself from the long arm of the courts by using an intermediary or by professing ignorance of the ultimate destination of his products." *Id. Accord Giotis v. Appollo of the Ozarks, Inc.,* 800 F.2d 660, 667 (7th Cir.1986) (discussing stream of commerce theory in similar fashion).

Thus, *Honeywell* demonstrates that the Seventh Circuit is receptive to the stream of commerce theory. However, the facts are distinguishable from the instant case in that the infringing party had prior contact with the plaintiff, knew of the patent, but nonetheless set up an exclusive distributorship by way of written contract to market the product in the United States. In this case, by contrast, there is no evidence that the Academy had any prior contact with the plaintiff, nor, more importantly, is there much of any evidence concerning any agreement between the Academy and McGaw Graphics.

The decision in *Nelson by Carson v. Park Industries,* 717 F.2d 1120 (7th Cir. 1983), *cert. den.,* 465 U.S. 1024, 104 S.Ct.

1277, 79 L.Ed.2d 682 (1984), in which the Seventh Circuit again reversed a Rule 12(b)(2) dismissal after finding personal jurisdiction proper under the stream of commerce theory, is also instructive. In *Nelson*, a child was injured when the cotton flannel shirt she was wearing ignited after contact with a flame. The child sought recovery from the manufacturer and distributors of the flannel shirt. The shirt was made by a Hong Kong firm and eventually made its way to a Woolworth's retail store in Wisconsin. The manufacturer and Woolworth's had no direct relationship; rather, the shirts were distributed to Woolworth's through a Hong Kong buying agent. The manufacturer had no other contacts with Wisconsin other than this indirect placing of the shirts into the stream of commerce. 717 F.2d at 1123.

The Seventh Circuit nonetheless found jurisdiction to exist over the Hong Kong manufacturer. The court began by noting that the *World–Wide Volkswagen* Court's recognition of a distinction among the various entities that might compose a distribution system of a product was pivotal to the case. *Nelson*, 717 F.2d at 1125. The court reasoned that the "relevant scope [of the foreseeable market] is generally broader with respect to manufacturers and primary distributors of products who are at the start of a distribution system and who thereby serve, directly or indirectly, and derive economic benefit from a wider market." *Id.* "Such manufacturers and distributors purposely conduct their activities to make their product available for purchase in as many forums as possible." *Id.*

The *Nelson* court then concentrated on whether the manufacturer and distributor were aware of the distribution system. The court held that knowledge and expectations of product entry into a forum are a prerequisite, but that *control* over the distribution of the product is not. 717 F.2d 1126, n. 7. The court then found jurisdiction proper. Affidavits from Woolworth officials alleged that the manufacturer and distributor were aware of Woolworth's distribution system. The court had no difficulty in finding that the distributor had

such knowledge because of its contractual relations with Woolworth. *Id.* at 1126–27.

As to the manufacturer, the court noted that its "knowledge of the flannel shirts' distribution is a closer question." *Nelson*, 717 F.2d at 1127. Nonetheless, the court found "that on the record established and under the standards governing at this stage of the litigation, [the Hong Kong manufacturer] was more than possibly aware of Woolworth's distribution system." *Id.* In particular, the court noted that Woolworth personnel annually visited the manufacturer's plant, and that one of the manufacturer's directors knew that the shirts would be exported to the United States and sold at Woolworth retail outlets. *Id.* Based on this evidence of knowledge on the manufacturer's part, the *Nelson* court concluded that the manufacturer's participation in the distribution system was purposeful enough such that "they should reasonably anticipate being haled into court in a forum where the system brought a [product] that allegedly caused injury." 717 F.2d at 1127.

The *Nelson* case is thus quite similar to this action in many respects. In both cases, the manufacturer produced a product that caused injury in the forum, but the manufacturer did not have direct contact with the plaintiff or the forum. In both cases the manufacturer put a significant amount of its products into the stream of commerce.

There is, however, a critical difference in the cases. In *Nelson*, which the court called a "close case," there was ample evidence that the manufacturer had knowledge of the distribution system such that it should have foreseen mass distribution in the several states. Representatives of Woolworth had visited the plant, and a director of the manufacturer knew of the distribution channels. In this case, though, the plaintiff has not come forth with sufficient evidence to show that the Academy had such knowledge of distribution. All that is presently before the Court is evidence of mass sales of the poster from the Academy to a New York company named McGaw Graphics. While there is evidence

that McGaw then sold the poster in Indiana, there is nothing tending to show that the Academy knew or should have known of such sales in this forum.[3] For all that the Court can surmise on the record before it, the Academy could have thought that McGaw was selling the poster only in New York.

Accordingly, this Court is forced to conclude, based on the record presently before it, that minimum contacts have not been shown sufficient for personal jurisdiction. While it is clear that the Academy made substantial sales of its poster to McGaw Graphics, and that, despite the Academy's affirmations to the contrary, some sort of relationship existed between the two,[4] there is nothing more before the Court concerning the Academy's knowledge of the distribution system. Although the Seventh Circuit does not require control over that system, there must be evidence sufficient to show that the Academy could foresee the eventual sale of the poster in Indiana.

The Court realizes that in "the stream of commerce setting ... it is not always possible to determine a manufacturer's actual knowledge of distant sales of its products." Comment, *The Stream of Commerce Doctrine, Barely Alive But Still Kicking*, 76 Geo.L.J. 203, 225 (1987). Moreover, the Court is concerned with the Academy's representations to this Court, which have been shown to be untrue or at least less than forthright on two instances.[5] Yet, on the evidence before the Court at this time, personal jurisdiction over the Academy has not been proved.

III.  *Venue under 28 U.S.C. § 1391(b)*

■ Assuming arguendo that jurisdiction were to exist, the issue of venue must be addressed. Venue of this action is governed by 28 U.S.C. § 1391(b), which provides as follows:

A civil action wherein jurisdiction is not founded solely upon diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

The question in this trademark infringement case is thus where the claim arose.

In *Leroy v. Great Western United Corporation*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), the Supreme Court had occasion to speak to the meaning of § 1391(b). The Court wrote that Congress did not intend to provide for venue at the residence of the plaintiff or to give that party unfettered choice among a host of different districts. 443 U.S. at 184, 99 S.Ct. at 2717. The broadest interpretation of the language "that is even arguably acceptable in the unusual case in which it is not clear that the claim arose in only one specific district [is that] a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility—in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but not the plaintiff)—may be assigned as the locus of the claim." *Id.* at 185, 99 S.Ct. at 2717.

The *Leroy* opinion "raises as many questions as it answers." 15 Wright & Miller, *Federal Practice* § 3806 at 51. "Although the Court was less clear in *Leroy* about what it was adopting than about what it was rejecting, the opinion can most reasonably be read as applying a test that looks to the weight of the contacts between the

---

3. The fact that James Dean was born in Indiana and that the Trust was formed here does not change this, for there is no evidence that the Academy knew either fact, nor, more importantly, is there any evidence that distribution was knowingly aimed towards Indiana by the Academy.

4. This fact is shown by the continuous, systematic nature of the sales, and is further supported by the existence of the 10% discount that was given on most sales to McGaw.

5. The Academy's affidavits to the effect that only 61 sales were made of the poster have been shown to be wholly untrue. And, the Academy's representation (Br. at 3, Diller affidavit ¶ 4) that "McGaw has no contract or agreement of any kind with the Academy" appears to unjustifiably downplay the fact that the parties are in a continuous supplier/buyer relationship in which a discount is routinely given. These representations are discussed *infra* at Part IV of this opinion.

**1372**

claim and a particular district." *Id.* § 3806 at 61. The Seventh Circuit has directed the courts it governs to apply *Leroy* as best they can in situations in which it is not clear that the plaintiff's claim arose in one specific judicial district. *John Walker & Sons v. DeMert & Dougherty, Inc.,* 821 F.2d 399, 406 (7th Cir.1987).

In this case, under the restrictive interpretation of § 1391(b) mandated by *Leroy* wherein the plaintiff is given little if any consideration, there are only two judicial districts in which it can be said that the claim against the Academy arose. The first is in the Central District of California where the defendant presumably makes the Dean Poster and makes substantial sales of the poster. The second is in the Southern District of New York where the Academy has made numerous sales of the poster. Unfortunately for the plaintiff, there is no evidence from which it can be said that the claim against the Academy arose in the Southern District of Indiana. The pre-*Leroy* cases that purport to allow venue in any district in which an infringing product is passed off simply carry no weight any longer. 15 Wright & Miller, *Federal Practice* § 3806 at 54 ("the pre-*Leroy* cases must be read with care, since those decisions that explained the basis for a conclusion often relied on reasoning that has been rejected in *Leroy.*").

That the claim against defendant McGaw Graphics may well have arisen in Indiana does not impact the venue analysis as to the claim against the Academy. "[T]he fact that a claim ... against some of the defendants arose in a district does not make that district a proper venue for other parties as to whom the claim arose somewhere else." 15 Wright & Miller, *Federal Practice* § 3807 at 77.

Thus, venue as to the claim against the Academy is improper in this district.

### IV. *The Academy is Sanctioned by Striking the Motion to Dismiss*

■ Sanctions may be imposed under Rule 11 on a party who files any court paper that is frivolous or improper. *Service Ideas, Inc. v. Traex Corp.,* 846 F.2d 1118, 1126 (7th Cir.1988). Whether there

has been a Rule 11 violation is a "judgment call" for the district court to make. *Flip Side Productions, Inc. v. Jam Productions,* 843 F.2d 1024, 1038 (7th Cir.1988). In determining whether Rule 11 has been violated, there are two levels of inquiry. First, objectively speaking, did the party make a reasonable inquiry into the facts and the law or was the paper filed for an improper purpose? *Brown v. Fed'n. of State Medical Boards,* 830 F.2d 1429, 1433 (7th Cir.1987). Second, if the Court finds that sanctions are warranted, the Court must fashion an appropriate remedy in its discretion. *Frantz v. United States Powerlifting Fed'n.,* 836 F.2d 1063, 1065 (7th Cir.1987); *Brown,* 830 F.2d at 1433–34.

■ In this case the Court finds that the Academy must be sanctioned for its filings in connection with the motion to dismiss. Specifically, in his original affidavit filed in support of the motion to dismiss on November 17, 1988, Bruce Davis, the Executive Administrator of the Academy, swore under oath that the Academy sells the poster to persons who visit its California offices, and that it also sells the Dean poster to Photo and Graphic Arts in California. Davis, on behalf of the Academy, then specifically stated that the "Academy does not sell the Dean Poster other than to Photo and Graphic Arts or persons who contact the Academy to request copies." (Affidavit, ¶ 8). Then, after plaintiff's counsel informed the Academy that it had knowledge of some sales in Indiana, Davis filed a supplemental affidavit in which he swore under oath that he had reviewed the Academy's records and that there were only 61 sales of the Dean poster in a three year period.

However, after the Court found further evidence necessary and ordered limited discovery on these issues, the story changed. The Academy, forced to respond to a request for production, provided records showing that the Academy had sold hundreds of the Dean Poster to Bruce McGaw Graphics in New York on a systematic, continuous basis. As detailed earlier in this opinion, more than 800 Dean Posters

were sold, accounting for almost $5,000 of revenues.

The Academy, however, relying on an affidavit of Teri Diller, asserts that the sales of the poster were really being made from Photo and Graphic Arts and that the Academy thus had no knowledge of the sales so as to excuse its prior affirmations. Such an assertion, however, belies the documented evidence. Almost all of the Payments from Bruce McGaw were made to the "Academy Foundation." Interestingly, all of the 61 posters that the Academy previously had disclosed were similarly recorded under the "Academy Foundation," and the checks received from the Indiana purchasers were made out of the "Academy Foundation." Moreover, there is even a letter of July 6, 1988, from the "Academy Foundation" to Bruce McGaw Graphics, which is signed by "Teri" (presumably the same Teri Diller from above), in which the Academy Foundation returned a McGaw check that had been made out to Photo and Graphic Arts and asked McGaw to make out a new one payable to the Foundation.

Thus, the inescapable conclusion is that the Academy was fully aware of the sales to McGaw. It received payment from them directly, it gave them discounts, and it corresponded with them. Payments for posters sold by mail order and posters sold to McGaw were both made out to the Academy Foundation. Thus, the Academy's assertion that its prior affirmations to the effect that there were only 61 sales of the poster are either untrue or blatantly misleading. The Academy dealt with McGaw on a regular, continuous basis, and while it may well have been trying to channel these transactions through Photo and Graphic Arts and certainly could do so if it pleased, it could not file a motion to dismiss and attempt to conceal such transactions from the Court by representing that it made only 61 sales. That is exactly what its agent did in his February 7, 1989, affidavit ("The records reflect that from October 2, 1985, to January 17, 1989, there were just 61

'sales' of the James Dean poster...."). The Academy cannot be heard to argue that the "sales" to McGaw via Photo and Graphic Arts were not really "sales." Yet that is the best that it can do given its prior affirmations.

Thus, based on this evidence the Court makes the objective finding that the Academy's previous affidavits were frivolous, or, alternatively, were filed for the improper purpose of concealing the full nature of its poster activities. Based on these factual findings, the Court holds that the Academy must be sanctioned under Rule 11.

In determining the proper sanction, the Court has a wide range of remedies to choose from in its discretion. *Insurance Benefit Administrators v. Martin,* 871 F.2d 1354, 1358–59 (7th Cir.1989); *Brown,* 830 F.2d at 1434. "Available sanctions range from such judicial actions as an off-the-record reprimand to reprimand on the record, to monetary assessments or penalties." *Martin,* 871 F.2d at 1359. "In choosing a sanction ... the least severe sanction adequate to serve the purpose should be imposed." *Brown,* 830 F.2d at 1437. In appropriate cases a district court should consider equitable considerations in determining the sanction. *Id.* at 1439.

In this case, because the Academy's frivolous and improper affidavits were part of the motion to dismiss, the Court finds the appropriate sanction to be the striking of the Academy's motion to dismiss.[6] Had the Academy been forthright from the beginning, this motion to dismiss could have been easily disposed of last year. Instead, the motion required further briefing and evidence and has cost the Court and the plaintiff valuable time and money. The Court in its discretion finds this sanction to be the most appropriate in light of the nature of the violation, and determines that no other sanctions are warranted.

■ Accordingly, notwithstanding the fact that personal jurisdiction and venue would be lacking in this case, the Court

---

**6.** That the Court has this power in an appropriate case cannot be disputed. The district courts even have the power to impose the more drastic sanction of dismissing actions with prejudice or

entering default judgments in eggregious cases. *See, e.g., Ocelot Oil Corp. v. Sparrow Industries,* 847 F.2d 1458, 1464 (10th Cir.1988) (listing cases).

STRIKES the Academy's motion to dismiss. Both personal jurisdiction and venue can be waived, and by violating Rule 11 in connection with these matters, the defendant has lost its opportunity to assert these defenses.[7]

The parties are to proceed with discovery and pre-trial preparations in this cause. A pre-trial conference will be held before the undersigned on Friday, August 25, 1989, at 2:00 PM in Room 330 of this Court. Local counsel for all parties shall be present, and California counsel for the Academy shall be available for phone consultation should it become necessary.

IT IS SO ORDERED.

7. In so ruling, the Court notes that the additional costs of defending this action in Indiana are at least comparable to the attorneys' fees that could otherwise be imposed. Moreover, if the motion to dismiss were not stricken, the Court would have the power to transfer this cause to New York where, it seems, personal jurisdiction and venue would lie against both defendants. This is so because under Rule 19(b), the Academy is an indispensable party to the claim against McGaw. Because venue and personal jurisdiction would exist over both defendants in New York, transfer under 28 U.S.C. § 1406(a) would be appropriate. *See* 15 Wright & Miller, *Federal Practice* § 3807 at 78–79 ("Even if objection is raised, if there is some other district in which venue would be proper for all parties and all defendants would be subject to service, the suit can be transferred there."); *Misko v. United States,* 77 F.R.D. 425, 429 (D.D.C.1978). This would be a proper procedure even though this transferring Court would lack personal jurisdiction over the Academy. *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466, 82 S.Ct. 913, 915, 8 L.Ed.2d 39 (1962) (§ 1406(a) is broad enough to authorize a transfer "whether the court in which it was filed had personal jurisdiction over the defendants or not.").

Thus, the financial burden on the Academy would be even greater if this Court were to rule on and grant the motion to dismiss, choose some other sanction, and transfer the action to New York instead of striking the motion to dismiss.