David J. RENNER and Darcy L. Renner, his wife, Appellants,

v.

**LANARD TOYS LIMITED.**

No. 94–3009.

United States Court of Appeals, Third Circuit.

Argued July 14, 1994.

Decided Aug. 25, 1994.

* Hon. Collins J. Seitz, United States Circuit Judge,   was limited to voting for panel rehearing.

Paul F. Burroughs (argued), Quinn, Buseck, Leemhuis, Toohey & Kroto, Erie, PA, for appellants.

Mary E. Wolfe (argued), Wilson, Elser, Moskowitz, Edelman & Dicker, Philadelphia, PA, for appellee.

Before: SLOVITER, Chief Judge, ROTH, Circuit Judge, and POLLAK,* District Judge.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

Appellants David J. Renner and his wife, Darcy L. Renner, appeal from the district court's order dismissing for lack of personal jurisdiction their products liability case against the defendant, Lanard Toys, Ltd. This case calls upon us to consider the current status of the "stream of commerce" theory of establishing specific jurisdiction over a defendant, a theory we have not addressed since our opinion in *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985). Since then, the Supreme Court issued its opinion in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

### I.

On July 14, 1991, David J. Renner was severely wounded when a Lanard Toy "prop shots stuntplane" he was using allegedly exploded, lodging shards of plastic into his face and left eye. The "prop shots stuntplane" is a cylinder with a propeller on it that flies skyward when a ripcord is pulled on the plane's handheld launching pad. The toy had been purchased for Renner's nephew at the McCrory's store in Erie, Pennsylvania. It had been supplied to McCrory's by its buying agent, Trade Power Associates, Ltd., which had purchased the toy from Lanard in Hong Kong.

On February 11, 1993, the Renners filed a complaint in the Erie County Court of Common Pleas alleging causes of action based on negligence, breach of warranty, strict liability, and loss of consortium. The complaint alleges that Lanard is a Hong Kong corporation with an office in New York, and is subject to jurisdiction in Pennsylvania. Lanard removed the case to the district court on November 12, 1993 and filed a motion to dismiss for lack of personal jurisdiction three days later, on November 15, 1993.

In support of its motion to dismiss, Lanard submitted a written statement, denominated an affidavit,[1] to the district court by its Managing Director, James W. Hesterberg, asserting that Lanard manufactures toys in Hong Kong and sells them to independent distributors F.O.B. (freight-on-board) Hong Kong and does not sell or manufacture toys in Pennsylvania; that Lanard owns no real property in Pennsylvania; that it has no employees, offices, post office boxes or bank accounts in Pennsylvania; that it has no exclusive distributors, or any financial interest in or control over any of its distributors; and that it has no way of knowing or controlling where distributors market its products.

In response, the Renners presented little evidence that would connect Lanard with Pennsylvania. They submitted two affidavits detailing that Lanard toys are still sold in Pennsylvania and are carried by K–Mart and Hills Department Stores in addition to McCrory's. The Renners also submitted two documents, that apparently had been produced to them by Lanard, each titled a "Test Report." App. at 116, 123. One report,

---

* Hon. Louis H. Pollak, United States Senior District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Although the form of the affidavit submitted to the district court did not have the notary seal, Lanard has proffered a copy of the affidavit with the seal to this court. In light of our disposition, we will treat Hesterberg's statement as notarized and Lanard can seek to correct the omission in the record upon remand.

dated November 13, 1990, is six pages and details the results of tests run by a Hong Kong laboratory on styles of the prop shot plane/helicopter to determine whether the samples complied with the "McCrory Stores Protocol with reference to ASTM Standard Consumer Safety Specification on Toy Safety F963–86." App. at 116, 118. The report lists McCrory Stores in York, Pennsylvania as the "Applicant." The report contains a notation showing that it was directed to the attention of a Mr. Michael Capuano, and "Debby (Lanard Toys Ltd.)." App. at 116. The second, dated August 31, 1991, is a similar six page report, lists McCrory Stores as the "Applicant," and also shows it was directed to the attention of Mr. Capuano and "Miss Debbie Chan (Lanard)." App. at 122.

Plaintiffs filed their response to the motion to dismiss on December 7, 1993. Two days later, on December 9, 1993, the district court dismissed the case for lack of personal jurisdiction because it found that there was no evidence that Lanard had "purposeful[ly] avail[ed]" itself of Pennsylvania's jurisdiction. District court op. at 1. Plaintiffs' motion for reconsideration was filed December 13 and denied by the Court on December 15. The plaintiffs filed a timely notice of appeal.

## II.

In determining whether a federal court can maintain jurisdiction over a nonresident defendant, we must first determine whether the exercise of jurisdiction is authorized under the state (or appropriate federal) long-arm statute and then whether it meets the requirements of the Due Process Clause of the United States Constitution. Pennsylvania's long-arm statute authorizes jurisdiction to the fullest extent permissible under the Constitution:

> the jurisdiction of the tribunals of this Commonwealth shall extend to all persons ... to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States.

42 Pa.Cons.Stat.Ann. § 5322(b) (1981). Therefore, this court's inquiry is solely whether the exercise of personal jurisdiction over the defendant would be constitutional. *See Mellon Bank (East) PSFS v. Farino*, 960 F.2d 1217, 1221 (3d Cir.1992) ("The Pennsylvania statute permits the courts of that state to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment. Therefore, the district court's exercise of personal jurisdiction over these defendants was proper as long as it did not violate due process." (citations omitted)); *Provident Nat'l Bank v. California Fed. Savings & Loan Ass'n*, 819 F.2d 434, 435–36 (3d Cir.1987) (same); *see also Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 481 (3d Cir.1993) (same); *Carteret Savings Bank, FA v. Shushan*, 954 F.2d 141, 144–45 (3d Cir.) (same with respect to New Jersey law), *cert. denied,* —— U.S. ——, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992).

The Renners contend that although Lanard is not physically present in Pennsylvania, it is constitutional to exercise jurisdiction over it because Lanard placed its products into a stream of commerce that led them into that state. The Renners advocate an expansive version of the "stream of commerce" theory, arguing that jurisdiction may be sustained whenever a manufacturer places a product in the stream of commerce with an awareness that the product will be sold to customers in the forum state. The Renners also assert that even if a narrower version of the theory is applied, they have submitted enough evidence to prove that the maintenance of personal jurisdiction over Lanard is permissible.

In *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 295, 100 S.Ct. 559, 564, 566, 62 L.Ed.2d 490 (1980), the Supreme Court rejected the contention that the mere foreseeability that a product one sells may end up in the forum state renders the seller amenable to suit there. In that case, plaintiffs, who were injured in an automobile accident in Oklahoma, sought to obtain jurisdiction in that state over the New York automobile dealer from whom one of the plaintiffs purchased the car and the dealer's New York wholesaler. The Court held that the plaintiff's unilateral act in bringing the automobile into Oklahoma was not in

itself enough to establish the requisite minimum contacts over the defendants. *Id.* at 298, 100 S.Ct. at 567. In his dissent, Justice Brennan alluded to the "stream of commerce" theory, noting that "[t]he sale of an automobile does *purposefully* inject the vehicle into the stream of interstate commerce so that it can travel to distant States," *id.* at 306, 100 S.Ct. at 584, but that discussion appears to have been influenced by the unique nature of the automobile within commerce.

This court first discussed the "stream of commerce" theory in *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 285 (3d Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981), in which we described it with approval as a "theory developed as a means of sustaining jurisdiction in products liability cases in which the product has traveled through an extensive chain of distribution before reaching the ultimate consumer." We explained that under this theory, "a manufacturer may be held amenable to process in a forum in which its products are sold, even if the products were sold indirectly through importers or distributors with independent sales and marketing schemes." *Id.*

DeJames, a New Jersey longshoreman, was injured on an automobile carrier boat while it was docked in New Jersey. He brought suit in New Jersey against, *inter alia,* Hitachi, a Japanese corporation, alleging that it had negligently converted that boat from a bulk carrier to an automobile carrier. The conversion had been performed in Japan; Hitachi's only contact with New Jersey was that the ship was docked there when plaintiff was injured.

We relied on the Supreme Court's decision in *World–Wide Volkswagen* in holding that Hitachi's customer's unilateral action in bringing the boat to New Jersey was insufficient to establish minimum contacts. *Id.* at 286. Nonetheless, we suggested in dictum that subjecting manufacturers who place their products in the "stream-of-commerce," even indirectly through importers or distrib-

utors with independent sales and marketing schemes, may be consistent with due process. *Id.* at 285.[2] We did not comment, however, on whether mere knowledge that a product would end up in a given state was itself enough to establish jurisdiction under a "stream of commerce" theory.

We again addressed the "stream of commerce" theory in *Max Daetwyler Corp. v. Meyer,* 762 F.2d 290 (3d Cir.) *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985), a case in which a patentee sought to establish jurisdiction in a patent infringement suit filed in Pennsylvania over Meyer, a West German corporation that made doctor blades in Germany which were sold in the United States by independent distributors. *See id.* at 291–92. During the years in question, one distributor had sold Meyer's blades to three customers in Pennsylvania. *See id.* at 298.

Although we did not question the viability of a "stream of commerce" theory as to manufacturers in products liability cases, we rejected plaintiff Max Daetwyler's attempt to establish jurisdiction pursuant to what we characterized as "an expansive application" of that theory under which "jurisdiction exists because Meyer, through [the distributor], participated in a distributive chain which might reasonably anticipate sales of Meyer products in major industrial markets, which should include Pennsylvania." *Id.* at 298. We relied on the absence of any evidence that defendant purposefully marketed its products in Pennsylvania, stating that,

> [a] review of the "stream of commerce" cases indicates that the manufacturers involved had made deliberate decisions to market their products in the forum state. The present case is thus distinguishable from those cases in which the foreign manufacturer of a defective product had either indirectly derived substantial benefit from the forum state or had a reasonable expectation of doing so.

Id. at 299–300 (citations omitted). We found that the distributor's intermittent sales of

---

**2.** In *DeJames,* we stated "[u]nderlying the assumption of jurisdiction in these cases is the belief that the fairness requirements of due process do not extend so far as to permit a manufac-

turer to insulate itself from the reach of the forum State's long-arm rule by using an intermediary or by professing ignorance of the ultimate destination of its products." 654 F.2d at 285.

Meyer's products in Pennsylvania could not support personal jurisdiction, "[n]or [could the distributor's] occasional advertisements of its generic products be deemed such a sustained promotional campaign, directed to residents of Pennsylvania, that jurisdiction over Meyer may be obtained thereby." *Id.* at 300.

Shortly thereafter, the Supreme Court discussed the "stream of commerce" theory in *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). A California plaintiff injured in a motorcycle accident in California filed a products liability suit in California against, *inter alia,* Cheng Shin, a Taiwan corporation that manufactured the motorcycle's tire tube, contending that the rear tire, tube, and sealant were defective. Cheng Shin impleaded Asahi Metal Industry Co., Ltd., a Japanese corporation, seeking indemnification from it because Asahi had manufactured the valve assemblies for Cheng Shin's tire tubes. The action between the plaintiff and Cheng Shin settled, leaving only the indemnity action between Cheng Shin and Asahi.

Asahi contested jurisdiction, noting that it had solicited no business in California nor did it have offices, agents or property there. Its sale of tube assemblies to Cheng Shin and several tire manufacturers took place in Taiwan, and it did not design nor did it control the distribution system that brought its components into products that were eventually sold in California. *Id.* at 106–08, 107 S.Ct. at 1029–30. The California Supreme Court concluded that Asahi "knew that some of the valve assemblies sold to Cheng Shin would be incorporated into tire tubes sold in California, and ... benefited indirectly from the sale in California of products incorporating its components," and it sustained jurisdiction on the basis of Asahi's "intentional act of placing its components into the stream of commerce" and "awareness that some of the components would eventually find their way into California." *Id.* at 108, 107 S.Ct. at 1030.

Justice O'Connor delivered the decision of the unanimous Court that it would be unconstitutional for California to exercise jurisdiction over Cheng Shin's claim against Asahi.

*Id.* at 113, 107 S.Ct. at 1032. All of the Justices agreed that the exercise of personal jurisdiction in that case was not consistent with fair play and substantial justice. The Court divided, however, on the scope of the "stream of commerce" theory which the California Supreme Court had applied to sustain jurisdiction.

In Part II–A of the opinion, writing for a plurality of four, Justice O'Connor found that the mere placement of a product into the stream of commerce with an awareness that it may end up in a particular state was not enough to establish minimum contacts. "[A]dditional conduct ... [that] may indicate an intent or purpose to serve the market in the forum State" is needed before personal jurisdiction can be exercised over the defendant, *id.* at 112, 107 S.Ct. at 1032, because "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,' " *id.* at 111, 107 S.Ct. at 1031 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985)).

Justice O'Connor provided the following examples of the type of "additional conduct" needed to establish purposeful availment and, therefore, minimum contacts: "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032. Justice O'Connor concluded:

> [A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.*

Justice Brennan, writing for four Justices in a concurring opinion, disagreed with this interpretation of the "stream of commerce" theory. He believed that if there is a "regular and anticipated flow of products from manufacture to distribution to retail sale"

and the defendant is aware that the final product is being marketed in the forum state, no additional conduct on the defendant's part need be shown to establish minimum contacts. *Id.* at 117, 107 S.Ct. at 1034.

Justice Stevens, the ninth vote, wrote a short concurring opinion (joined by Justices White and Blackmun who had also joined Justice Brennan's opinion). He rejected the plurality's assumption that "an unwavering line can be drawn between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market." *Id.* at 122, 107 S.Ct. at 1037. He stated that whether or not Asahi's conduct, which was arguably more than the placement of a product into the stream of commerce, rises to the level of purposeful availment "requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components." *Id.* He concluded that in most cases a regular course of delivering over 100,000 units annually would constitute "purposeful availment." *Id.*

This court has not revisited the "stream of commerce" theory since the Supreme Court's opinion in *Asahi.* Although the 4–4–1 vote of the Supreme Court makes it difficult to even attempt to promulgate the last word on the "stream of commerce" theory, certain guidelines have emerged. It is clear, for example, from *Asahi* and its precursors that there must have been some "purposeful availment" by the defendant of the forum state. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (minimum contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State"). Even under Justice Brennan's view, the mere knowledge or awareness that one's products will end up in the forum state without some regularity of shipment would not be enough. The contact must be purposeful, rather than incidental, because the stream of commerce does not refer to "unpredictable currents or eddies." *Asahi,* 480 U.S. at 117, 107 S.Ct. at 1034 (Brennan, J., concurring).

It also appears from *Asahi* and its precursors that the absence of direct sales or ship-ments into the forum is not dispositive. Although, of course, the presence of direct shipments will show the defendant's purposeful availment, it appears that the plaintiff may show "affiliating circumstances" by defendant, *see World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. at 566, in other ways. Nothing in Justice O'Connor's plurality opinion suggests that the fact that a foreign manufacturer or seller rids itself of title by a sale F.O.B. a foreign port is enough to insulate that manufacturer or seller from jurisdiction if there is the other type of activity to which the plurality opinion referred.

Because the distinction between Justices O'Connor's view and Justice Stevens' may be a subtle one, requiring another Supreme Court decision to flesh out the lines between them, most of the circuits to have addressed the "stream of commerce" theory since *Asahi* have chosen to avoid taking a position on the current status, attempting when possible to decide the case on the basis of the facts on record. *See, e.g., Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1566 (Fed.Cir.1994), *cert. dismissed,* —— U.S. ——, 115 S.Ct. 18, 129 L.Ed.2d 917 (1994); *Tobin v. Astra Pharmaceutical Prods., Inc.,* 993 F.2d 528, 543 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993); *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1548 (11th Cir. 1993); *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 382 n. 3 (9th Cir.1990), *rev'd on other grounds,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). *But see Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 613–15 (8th Cir.1994) (adopting Justice Brennan's *Asahi* opinion); *Ruston Gas Turbines, Inc. v. Donaldson Co.,* 9 F.3d 415, 420 (5th Cir.1993) (same); *Dehmlow v. Austin Fireworks,* 963 F.2d 941, 947 (7th Cir.1992) (same).

It is likely that even in circuits adopting Justice O'Connor's position, *see, e.g., Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 683 (1st Cir.1992), the position expressed by Justice Stevens would not lead to a different result. Thus, for example, Judge Keeton, writing for the First Circuit in *Boit,* held that in order to establish specific jurisdiction over a non-resi-

dent manufacturer, the plaintiff must establish that the manufacturer "intended to serve the [forum state's] market." *See Boit,* 967 F.2d at 683. This intention to serve the market stems from the examples provided by Justice O'Connor in *Asahi* as activities that would show "purposeful availment." *See Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032. This view might meld with that of Justice Stevens (and perhaps with that of Justice Brennan) because it is likely that if a significant amount of the defendant's products are sold to customers in any given state, the plaintiff will be able to show an intentional marketing toward that state.

It is evident that the record adduced by the Renners at this time does not alone show the type of "purposeful availment" by Lanard in Pennsylvania that would satisfy the requisite minimum contacts. On the other hand, the record is ambiguous. It is possible that if Lanard was involved in having its products tested to meet the "McCrory Stores Protocol" for McCrory's Stores in York, Pennsylvania, that would show that Lanard intentionally markets or even designs its toys for the Pennsylvania market, one of Justice O'Connor's *Asahi* examples. The record does not show Lanard's connection with the laboratory tests run for McCrory's. Notwithstanding the Renners' contention that the reports evidence purposeful availment, those papers show only that Lanard received copies of tests that were run. We cannot assume the mere receipt of copies constitutes active conduct on Lanard's part to design or market a product to the state.

Additionally, it is unclear whether the fact that Lanard sold its toys to Trade Power Associates, Ltd., which apparently was a buying agent for McCrory's, might constitute "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State," one of the other examples listed by Justice O'Connor in *Asahi. Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032; *see also Boit,* 967 F.2d at 683. In short, the record is incomplete.

The Renners need not accept Lanard's analysis of the facts without a chance to probe further. They are entitled to conduct discovery into the jurisdictional facts. However, this case was disposed of without any opportunity for the normal discovery process. As noted at the outset of this opinion, Lanard moved for dismissal three days after the case was removed, the Renners had less than a month to respond to that motion, and the case was dismissed within several days of their response. Although the Renners failed to make formal discovery requests, they preserved their position that discovery was needed in their Memorandum of Law in opposition to Lanard's motion to dismiss for lack of personal jurisdiction.[3]

Numerous cases have sustained the right of plaintiffs to conduct discovery before the district court dismisses for lack of personal jurisdiction. *See Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415, 425 (D.C.Cir.1991) ("As a general matter, discovery under the Federal Rules of Civil Procedure should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction."); *Wyatt v. Kaplan,* 686 F.2d 276, 283 (5th Cir.1982) ("When a defendant challenges personal jurisdiction, courts generally permit depositions confined to the issues raised in the motion to dismiss. In an appropriate case, we will not hesitate to reverse a dismissal for lack of personal jurisdiction, on the ground that the plaintiff was improperly denied discovery."); *Fraley v. Chesapeake & Ohio Ry. Co.,* 397 F.2d 1, 3 (3d Cir.1968) (holding that district court erred in refusing to direct defendant to answer interrogatories designed to elicit responses relevant to whether personal jurisdiction could be exercised over defendant).

Such discovery might shed information on what Trade Power Associates, Ltd. is, whether advertisements for Lanard Toys are seen or heard in Pennsylvania, whether Lanard designs its toys with a market in mind that includes Pennsylvania, how many Lanard products are sold in Pennsylvania, and/or

---

**3.** In that Memorandum, the Renners stated, "[t]he Plaintiffs ... note that no discovery has taken place in this matter. As this is a dispositive motion, and one heavily reliant on the presence or absence of facts, this Honorable Court has the discretion to dismiss the Motion as premature, or set a period for discovery on issues relevant to the instant matter." App. at 93.

whether Lanard participates in toy shows that are aimed at selling toys to a multi-state market that includes Pennsylvania. Under the circumstances, the district court should have deferred ruling on the motion and given the Renners time to conduct discovery so that they could attempt to ascertain whether there was the kind of purposeful availment that would show minimum contacts.

### III.

For the foregoing reasons, we will vacate the district court's order dismissing the action and remand to the district court for further proceedings consistent with this opinion. Moreover, if the Renners cannot show such minimum contacts, the district court may consider, if requested by the Renners, whether it would be appropriate to transfer this action to New York pursuant to 28 U.S.C. § 1406 or 28 U.S.C. § 1631.