**Amanda ANDERSEN, nfr Kenneth Andersen, et al., Plaintiffs,**

v.

**SPORTMART, INC., et al., Defendants.**

No. 2:94–CV–136.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

May 15, 1998.

Thomas F. Macke, Glenn J. Tabor, Blachly, Tabor, Bozik and Hartman, Valparaiso, IN, James E. Hullverson, St. Louis, MO, for Amanda Andersen, Kenneth Andersen, Linda Andersen.

Robert D. Brown, Spangler, Jennings and Dougherty, P.C., Merrillville, IN, David C. Bohrer, Kathryn C. Thomas, Oppenheimer, Wolff & Donnelly, Chicago, IL, for Sportmart, Inc., General Sportscraft Co. Ltd., Inc., Foremost Sport Co., a Division of General Sportscraft, Foremost Sport Co., A & O Rubber Plastics.

R. Kent Rowe, III, Rowe & Rowe, South Bend, IN, for Wilson Sporting Goods Co., Inc.

David C. Jensen, David J. Beach, Eichhorn & Eichhorn, Hammond, IN, for Robert Brown.

Douglas K. Dieterly, Barnes & Thornburg, South Bend, IN, for Taiwan Daido, Ltd.

### MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I.  INTRODUCTION

This matter is before the Court on the May 5, 1998, motion of General Sportcraft ("Sportcraft"), a Third Party Plaintiff, for leave to conduct discovery on the issue of whether personal jurisdiction exists over the Third Party Defendant, Taiwan Daido ("Daido"). Daido filed a response on May 8, 1998, and oral argument was heard on the motion on May 12, 1998. For the following reasons, Sportcraft's motion will be GRANTED.

## II. PROCEDURAL AND FACTUAL BACKGROUND

On July 27, 1992, Amanda Anderson ("Anderson") was injured in Indiana while using an allegedly defective batting tee purchased in Indiana. This batting tee was originally manufactured in Taiwan by A & O Rubber and Plastic Ind. Co. Ltd. ("A & O"), and distributed and sold in the United States by Sportcraft. Daido is a Taiwan corporation that acts as a regional purchasing agent for companies outside of Asia (such as Sportcraft) which seek to purchase goods manufactured by companies in Asia (such as A & O). Sportcraft Br. in Supp. exh. G ¶ 5 ("Tsukagoshi aff.").

Anderson, by and through her parents, filed a tort claim against Sportcraft, which has since been settled. Sportcraft then filed suit against Daido seeking contribution commensurate with its alleged fault in causing Anderson's injuries. Daido did not answer Sportcraft's complaint, but filed a motion to dismiss, arguing that this Court does not have personal jurisdiction over Daido. Sportcraft filed the instant motion in an effort to obtain discovery to support its forthcoming response to Daido's motion to dismiss. The following is a recitation of the facts relevant to the jurisdictional inquiry drawn from the factual record as it now exists.

Daido acknowledges that it "arranged" for the sale of certain products, including batting tees of the type that injured Anderson, from A & O to Sportcraft. See id. exh. F at 3 (Daido's Brief Supporting its Motion to Dismiss). At oral argument Daido clarified this "arrangement," explaining that Daido acted as a distributor for A & O by purchasing and taking title to the batting tees, then reselling them to Sportcraft. See also id. exh. F. at 2. Sportcraft purchased and took title of the batting tees free on board ("F.O.B.")[1] in Taiwan, then shipped the goods to the United States, where it controlled the subsequent marketing and distribution of the batting tees.

The sale of the particular batting tees at issue in this case was not a one time deal; Sportcraft and Daido had an ongoing contractual relationship for the sale of goods manufactured in Asia. Indeed, for each of the past several years Sportcraft has paid Daido over $750,000 in commission fees, which represents five percent of the approximately $15 million that Sportcraft earned per year from the sales of products it buys from Daido. The record is devoid of any information as to any of Daido's business dealings with American distributors other than Sportcraft.

## III. DISCUSSION

Daido's position, as explained at oral argument, is that Sportcraft has failed to make even a prima facie showing that personal jurisdiction exists over Daido in Indiana, and thus Sportcraft is not entitled to conduct discovery into the personal jurisdiction issue. Sportcraft's position is that the present record provides at least a prima facie showing that personal jurisdiction is proper in this Court over Daido. Although the merits of Daido's motion to dismiss are not properly at issue for purposes of the instant motion, the Court's analysis necessarily requires us to first understand the Seventh Circuit's personal jurisdiction jurisprudence in order to properly focus the relevant discovery inquiries.

### A. Personal Jurisdiction Principles

■ A federal district court exercising diversity jurisdiction has personal jurisdiction over a nonresident defendant "only if a court of the state in which it sits would have such jurisdiction." Wilson v. Humphreys (Cayman) Ltd., 916 F.2d 1239, 1243 (7th Cir. 1990), cert. denied, 499 U.S. 947, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991) (quoting Turnock v. Cope, 816 F.2d 332, 334 (7th Cir. 1987)). The Wilson court explained that a two-step procedure is traditionally employed when determining whether a state court would have jurisdiction over a nonresident defendant. First, we examine whether the state long-arm statute allows jurisdiction, and second, we determine whether the asser-

---

1. "F.O.B." is a method of shipment whereby goods are delivered at a designated location, usually a transportation depot, where legal title and thus the risk of loss passes from seller to buyer. See BLACK'S LAW DICTIONARY 599 (5th ed.1979); U.C.C. § 2–319(1).

tion of jurisdiction complies with constitutional due process standards. *Wilson*, 916 F.2d at 1243 (citations omitted). It is well established that Indiana's long-arm statute extends personal jurisdiction to the limit allowed under the Due Process clause of the Fourteenth Amendment, and therefore we need only consider whether the assertion of jurisdiction over Daido violates due process. *See, e.g., NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A.*, 28 F.3d 572, 580 (7th Cir.1994) (citing *Wilson*, 916 F.2d at 1243).

■ The due process analysis requires that a nonresident defendant have "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).[2] Of course, the substance of the "minimum contacts" analysis depends upon whether a plaintiff seeks to assert "general" or "specific" personal jurisdiction over a defendant. *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997).

### 1. Specific Jurisdiction

As the Seventh Circuit recently explained:
In specific jurisdiction cases, we must decide whether a defendant has "purposefully established minimum contacts within the forum State" and consider whether, by traditional standards, those contacts would make personal jurisdiction reasonable and fair under the circumstances. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77, 105 S.Ct. 2174, 2184–85, 85 L.Ed.2d 528 (1985). Crucial to the minimum contacts analysis is a showing that the defendant "should reasonably anticipate being haled into court [in the forum State]," *id.* at 474, 105 S.Ct. at 2183 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)), because the defendant has "purposefully avail[ed] itself of the privilege of conducting activities" there, *Burger King*, 471 U.S. at 474–75, 105 S.Ct. at 2183 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)).
*RAR, Inc.*, 107 F.3d at 1277.

■ The facts of this case make it particularly amenable to the "stream of commerce" analysis of specific jurisdiction. The Supreme Court first explained the stream of commerce theory in *World–Wide Volkswagen:* "[t]he forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce *with the expectation that they will be purchased by consumers in the forum state.*" *World–Wide Volkswagen*, 444 U.S. at 297–98, 100 S.Ct. at 567 (emphasis added). The Seventh Circuit subsequently took a broad view of the stream of commerce theory, holding that a defendant distributor or manufacturer may reasonably anticipate being haled into court when it places goods into the stream of commerce with some knowledge or awareness that the system employed for distribution will result in the goods being destined for retail sale in the forum state. *See Nelson v. Park Industries, Inc.*, 717 F.2d 1120, 1126 (7th Cir.1983), *cert. denied sub nom. United Garment Mfg. Co., Ltd. v. Nelson*, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984). The *Nelson* court reasoned that the "relevant scope of the foreseeable market is generally broader with respect to ... primary distributors of products what are at the start of a distribution system and who thereby serve, directly or indirectly, and derive economic benefit from a wider market" because "such ... distributors purposely conduct their activities to make their products available for purchase in as many forums as possible." *The Curtis Management Group, Inc. v. Academy of Motion Picture Arts and Sciences*, 717 F.Supp. 1362, 1370 (S.D.Ind.1989) (quoting *Nelson*, 717 F.2d at 1125).

Under the broad Seventh Circuit test, the critical fact is whether the defendant knows that the distribution system employed to dis-

---

**2.** The instant discovery dispute only involves the "minimum contacts" analysis, and thus no discussion is warranted pertaining to the "fair play and substantial justice" analysis.

perse its products for retail sale is designed to bring the defendant's products into the forum state. *Id.* Moreover, it is reasonable for a defendant to anticipate that an awareness or knowledge of a distribution system that ships its goods throughout the United States, and does not specifically limit that distribution territory, will suffice to establish minimum contacts with each and every state. *See id.; Carr v. Pouilloux, S.A.*, 947 F.Supp. 393, 398 (C.D.Ill.1996) ("Thus, at a minimum [the defendant] expressly marketed its products through a distributor who agreed to serve as its sales agent in the entire United States, including Illinois.") 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1069, at 391–92 (2d ed. 1987) ("WRIGHT & MILLER") ("It seems appropriate for the place of injury to assert jurisdiction when the entry of defendant's product or parts into the forum is part of a consistent pattern of multistate business so that it is reasonable for him to foresee the potential dispersion of his products at the time they are sold.").

Daido vigorously asserted both in its briefs and at oral argument that the Supreme Court's decision in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), rejected the stream of commerce theory and mandates a more restrictive view of the minimum contacts analysis: "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State *does not convert the mere act of placing the product into the stream into an act purposefully directed towards the forum state.*" *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032 (O'Connor, J., plurality opinion) (emphasis added). However, as indicated, Justice O'Connor could only muster a four-Justice plurality for her position, and another four-Justice plurality, speaking through Justice Brennan, expressly adopted the more permissive stream of commerce theory: "As long as a participant in [the distribution] process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.* at 117, 107 S.Ct. at 1034 (Brennan, J., plurality opinion).

The upshot of the split plurality *Asahi* decision is that the Seventh Circuit's broad stream of commerce theory of minimum contacts remains determinative in this circuit. Indeed, the Seventh Circuit has expressly recognized that its broad approach was not overruled by *Asahi*, and thus, despite Daido's protestations, the stream of commerce analysis remains viable and binding upon this Court. *See Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir.1992) (refusing to depart from the stream of commerce approach "on a belief that present Supreme Court Justices would not readily agree with past [Seventh Circuit] decisions"). Therefore, the critical inquiry is whether Daido had the requisite degree of knowledge or awareness that Sportcraft's distribution system dispersed its products for retail sale either specifically to Indiana, or on a nationwide basis. *Nelson*, 717 F.2d at 1126.

### 2. General Jurisdiction

When a cause of action does not arise out of or relate to a defendant's activities in a forum, a court may still exercise general jurisdiction over that defendant if the defendant has "continuous and systematic business contacts" with the forum. *Logan Productions, Inc. v. Optibase, Inc.*, 103 F.3d 49, 52 (7th Cir.1996) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984)).[3] Courts and commentators have identified a variety of factors that are relevant to the question of whether a corporation's activities constitute carrying on "continuous and systematic business" within a particular state, including (but certainly not limited to) the volume of the corporation's business in a state; whether the corporation maintains an office or employees within the state; whether the corporation sends agents into the state to conduct business, or adver-

---

**3.** A court will also consider in its general jurisdiction analysis a defendant's contacts with the forum state, despite the fact that those contacts may be insufficient in themselves to provide specific jurisdiction. *See Gallert v. Courtaulds Packaging Co., Inc.*, 4 F.Supp.2d 825, 830–31 (S.D.Ind.1998) (citing *Keeton v. Hustler*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984); *Charlesworth v. Marco Mfg. Co.*, 878 F.Supp. 1196, 1201 (N.D.Ind.1995)).

tises and solicits business in the state; and whether the corporation designates an agent for service of process in the state. *See generally Helicopteros,* 466 U.S. at 11–42, 416, 104 S.Ct. at 1870–71, 1873; *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 445–46, 72 S.Ct. 413, 418–19, 96 L.Ed. 485 (1952); WRIGHT & MILLER § 1069, at 348–355 (collecting cases). No one factor is dispositive, but "[i]n practice, the standard for establishing general jurisdiction is very high." *Intermatic, Inc. v. Taymac Corp.,* 815 F.Supp. 290, 293 (S.D.Ind.1993) (citing *Wilson,* 916 F.2d at 1245).

Having established the Seventh Circuit law guiding the merits of the personal jurisdiction issue, we must now decide within that general framework the appropriate standard for reviewing Sportcraft's motion for leave to conduct discovery.

### B. The Prima Facie Case—Unlocking the Personal Jurisdiction Discovery Door

■ "It is well established that a federal district court has the power to require a defendant to respond to discovery requests relevant to his or her motion to dismiss for lack of jurisdiction." *Ellis v. Fortune Seas, Ltd.,* 175 F.R.D. 308, 311 (S.D.Ind.1997) (citing *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982));[4] *see also Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 n. 12, 98 S.Ct. 2380, 2389 n. 13, 57 L.Ed.2d 253 (1978) ("where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues"); 6 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 26.41[6] (3d ed. 1997) ("MOORE'S") (personal jurisdiction may be the subject of discovery). The rationale behind this general rule is supported by the design of the Federal Rules of Civil Procedure; Rule 26(1) permits liberal discovery of all facts which are relevant and not privileged, and while Rule 8 requires a plaintiff to allege facts demonstrating subject matter jurisdiction, it imposes no requirement that the complaint allege facts demonstrating personal

jurisdiction. *See, e.g., Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 474 (D.Del.1995) ("Noticeably absent from [Fed.R.Civ.P. 8] is a requirement of a statement setting forth the grounds upon which the court has personal jurisdiction over the defendant."); 5A WRIGHT & MILLER § 1363, at 458 (2d ed.1990) ("there is no requirement that personal jurisdiction be alleged [in a complaint]").

Thus, as the District of Columbia Circuit observed, "As a general matter, discovery under the Federal Rules of Civil Procedure should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction." *Edmond v. United States Postal Service Gen. Counsel,* 949 F.2d 415, 428 (D.C.Cir.1991). In fact, a district court risks abusing its discretion by not allowing some limited discovery into the personal jurisdiction issue. *See Wyatt v. Kaplan,* 686 F.2d 276, 283 (5th Cir.1982) ("When a defendant challenges personal jurisdiction, courts generally permit depositions confined to issues raised in the motion to dismiss. In an appropriate case, we will not hesitate to reverse a dismissal for lack of personal jurisdiction, on the ground that the plaintiff was improperly denied discovery."); *accord Majd–Pour v. Georgiana Community Hosp., Inc.,* 724 F.2d 901, 903 (11th Cir.1984); *Fraley v. Chesapeake & Ohio Ry. Co.,* 397 F.2d 1, 3 (3d Cir.1968); MOORE'S § 26.41[6] at 26–103.

■ However, it is also well established that a plaintiff does not enjoy an automatic right to discovery pertaining to personal jurisdiction in every case. *See, e.g., Ellis,* 175 F.R.D. at 312. A plaintiff must make a threshold or prima facie showing with some competent evidence demonstrating that personal jurisdiction *might* exist over a defendant in order to be entitled to jurisdictional discovery. *See id.; Hansen,* 163 F.R.D. at 475; *see also Rich v. KIS California, Inc.,* 121 F.R.D. 254, 259 (M.D.N.C.1988). For example, a plaintiff is entitled to jurisdictional discovery if he or she can show that the factual record is at least ambiguous or unclear on the jurisdiction issue. *See Hansen,*

---

**4.** The refusal to comply with such discovery could result in the Court finding that personal jurisdiction exists over Daido. *Insurance Corp.*

*of Ireland,* 456 U.S. at 706–09, 102 S.Ct. at 2106–08.

163 F.R.D. at 475 (citing *Renner v. Lanard Toys, Ltd.*, 33 F.3d 277, 283 (3d Cir.1994)). This standard is quite low, but a plaintiff's discovery request will nevertheless be denied if it is only based upon "bare," "attenuated," or "unsupported" assertions of personal jurisdiction, or when a plaintiff's claim appears to be "clearly frivolous." *See generally Ellis*, 175 F.R.D. at 312 (collecting cases). With these principles in mind, we now turn to the question of whether Sportcraft has provided the Court with enough evidence to establish the requisite prima facie showing that this Court has jurisdiction over Daido.

## C. Analysis

### 1. *Specific Jurisdiction*

■ Sportcraft has clearly established a prima facie showing of specific jurisdiction over Daido given the Seventh Circuit's broad stream of commerce minimum contacts analysis. Most importantly, Daido does not seriously challenge the fact that at one time it possessed title to the batting tee that actually caused the injury in this case. This fact alone is enough to establish a prima facie showing of specific jurisdiction because the very physical presence in Indiana of the batting tee, which Daido caused to be distributed in the United States, indicates that Daido might have purposefully availed itself of the Indiana market. *See Rich*, 121 F.R.D. at 259 (threshold showing that third party defendant manufactured the allegedly defective equipment at issue was sufficient to permit jurisdictional discovery).

Moreover, the Tsukagoshi affidavit does not specifically address the most critical factor in the Seventh Circuit's specific jurisdiction stream of commerce jurisprudence, which in this case is whether Daido was aware or had knowledge of Sportcraft's distribution system. *See Nelson*, 717 F.2d at 1126. Tsukagoshi asserts that Daido did not "design or control" Sportcraft's United States distribution system, but any mention of its knowledge (or lack thereof) of Sport-

craft's distribution system is conspicuously absent from the affidavit. *See* Tsukagoshi aff. ¶ 18. This ambiguity leads to the conclusion that Sportcraft is entitled to probe into Daido's knowledge or expectations of its relationship with Sportcraft, since this discovery may shed some light on whether Daido knew or believed that Sportcraft was serving as its sales agent either in Indiana or throughout the whole United States, which would lead to the conclusion that Daido was purposefully availing itself of the Indiana market. *See Nelson*, 717 F.2d at 1126; 4 WRIGHT & MILLER § 1069, at 391–92. At bottom, Sportcraft's theory of specific jurisdiction over Daido is not frivolous, but in fact has some support in the record, and therefore its motion for leave to conduct limited jurisdictional discovery will be granted.

### 2. *General Jurisdiction*

■ The record also supports the conclusion that Sportcraft should be allowed to conduct limited discovery pertaining to general jurisdiction. Sportcraft indicated in its briefs and at oral argument that it has sold over $15 million of Daido products per year for the last several years. More importantly, Sportcraft indicated that it had no information as to whether Daido engages in business with other American distributors, or the volume of such other business. Daido's rather large volume of business with Sportcraft, which apparently sells and markets its products in Indiana, raises at least the possibility that Daido's contacts with Indiana are "continuous and systematic."[5] Although Daido asserts that it does no business directly in Indiana, Sportcraft is entitled to discover whether and to what extent Daido's other distributors market Daido's products in Indiana.

### 3. *Renner v. Lanard Toys, Ltd.*

The conclusion that some limited jurisdictional discovery is warranted as to both specific and general jurisdiction in this case is bolstered by the Third Circuit's opinion in

---

**5.** For example, we note that an Indiana district court has recently ruled that a company doing roughly $85 million worth of business in Indiana over a four year period (although this total represented only 0.055% of its annual sales nationwide), demonstrates that that company had continuous and systematic contacts with this state. *See Gallert*, 4 F.Supp.2d at 830–32.

the factually similar case of *Renner v. Lanard Toys, Ltd.*, 33 F.3d 277 (3d Cir.1994). The *Renner* plaintiff was severely injured in Pennsylvania by an allegedly defective toy airplane he had purchased from a McCrory's store in Pennsylvania. The toy had been supplied to McCrory's from its buying agent, Trade Power Associates, Ltd. ("Trade Power"), which had purchased the toy F.O.B. Hong Kong from Lanard Toys Ltd. ("Lanard"), a Hong Kong corporation that had manufactured the toy.

Lanard moved to dismiss based on lack of personal jurisdiction, relying upon the assertions contained in an affidavit executed by its Managing Director. Through that affidavit, Lanard admitted that it manufactured the toy and distributed it to Trade Power F.O.B. Hong Kong, but contended that it did not sell or manufacture toys in Pennsylvania; had no employees in Pennsylvania; did not maintain any bank accounts or real property in Pennsylvania; had no control over its toys after selling them to distributors in Hong Kong; and finally, asserted that it had no way of knowing or controlling where distributors marketed its products. *Renner*, 33 F.3d at 278. In response, the plaintiff presented little evidence connecting Lanard to Pennsylvania. The district court granted the motion to dismiss, finding that Renner had not shown that Lanard had "purposefully availed itself of Pennsylvania's jurisdiction." *Id.* at 279.

On appeal, the Third Circuit engaged in a thorough discussion of the history of the stream of commerce theory of minimum contacts. *Id.* at 279–83.[6] The court then agreed with the district court's conclusion that on the current record, Renner could not show the required "purposeful availment" to Pennsylvania to satisfy the minimum contacts in-

quiry for Lanard. However, this conclusion did not end the *Renner* court's review. The Third Circuit explained that the district court abused its discretion when it dismissed the case without any opportunity for jurisdictional discovery, explaining that the record supported at least an inference that jurisdiction might exist over Lanard, and thus some limited jurisdictional discovery was warranted. The court was concerned that while the plaintiff's evidence was not by itself sufficient to establish Lanard's minimum contacts with Pennsylvania, the record, even including Lanard's affidavit, was "unclear," "ambiguous," and "incomplete." Specifically, the Third Circuit opined that the record did not preclude the possibility that Lanard's sale of its toys to Trade Power, which was a buying agent for McCrory's, might constitute Lanard's purposeful availment of the Pennsylvania market. The court emphasized that "the [plaintiff] need not accept Lanard's analysis of the facts [through its affidavit] without a chance to probe further," *id.* at 283, and concluded that the Renners were entitled to jurisdictional discovery.[7]

The circumstances and legal posturing of Daido and Lanard are strikingly similar. Both are foreign defendants who sold allegedly defective goods to an American distributor. Even more importantly, the affidavit evidence offered by Daido and Lanard in support of their respective motions to dismiss are nearly identical; both asserted that they did not sell goods in the forum state, both claimed to have no property or employees in the forum state, and finally, they each argued that they had no control over their American distributors once the goods were sold F.O.B. Hong Kong or Taiwan.[8] Finally, the respec-

---

**6.** In particular, the *Renner* court correctly recognized that Justice Brennan's stream of commerce position in *Asahi* had been adopted by the Seventh Circuit. *Id.* at 282 (citing *Dehmlow*, 963 F.2d at 947). The *Renner* court did not stake out an identifiable position for the Third Circuit on this issue, preferring instead to decide the case on the specific facts before it, which it found to be the approach taken by a majority of the circuits since *Asahi. See id.* at 282–83.

**7.** The Renners had not, like Sportcraft, sought jurisdictional discovery through a motion. However, they preserved the issue for appeal by argu-

ing in response to the motion to dismiss that such discovery was needed. *Id.* at 283 & n. 3.

**8.** The *Renner* court specifically noted that Justice O'Connor's plurality opinion does not suggest that the mere fact that a foreign manufacturer or distributor rids itself of title by a sale F.O.B. in a foreign port automatically insulates that manufacturer or seller from jurisdiction. *Id.* at 282. *See also Carr*, 947 F.Supp. at 397 ("the Seventh Circuit has rejected the position that a manufacturer is absolved of all liability for a product once that product is transferred to a distributor for

tive records reflect that both Lanard and Daido sold the allegedly defective goods to a distributor which then sold the goods in the forum state, thus creating the possibility that further discovery might show that this conduct constituted purposeful availment of the markets of the forum state. Therefore, like the *Renner* court, we find the record before us to be incomplete and ambiguous, particularly with regard to the critical issue of Daido's knowledge of Sportcraft's distribution system, and find that limited discovery pertaining to both specific and general personal jurisdiction is warranted. *Cf. Curtis Management Group,* 717 F.Supp. 1362, 1364 (court believed the jurisdictional issue was a close one, and chose to allow discovery so as to have the benefit of further evidence before ruling).

### 4. Scope of Discovery

Having found that Sportcraft is entitled to conduct discovery on the issue of personal jurisdiction, we now must adduce the proper scope of that discovery. This discovery should not be expansive since it does not go to the merits of the case, yet it should be broad enough to allow Sportcraft to pursue both the specific and general jurisdiction theories until one or the other is conclusively ruled out. *See Fraley,* 397 F.2d at 3; *Int'l Molders & Allied Workers v. United Foundries, Inc.,* 644 F.Supp. 499, 506 (M.D.Pa.1986) (citing *Compagnie des Bauxites de Guinee v. L'Union Atlantique, S.A. d'Assurances,* 723 F.2d 357, 362 (3d Cir.1983)).

The *Renner* opinion sheds light on what is properly within the scope of Sportcraft's discovery. According to the *Renner* court, discovery pertaining to Lanard's advertising that might have been seen or heard in Pennsylvania, the number of Lanard's toys sold in Pennsylvania, as well as whether Lanard participated in toy trade shows aimed at selling toys in a multi-state market including Pennsylvania, all would produce information relevant to the minimum contacts and/or continuous and systematic business contacts analyses. *See Renner,* 33 F.3d at 283–84. For the sake of clarity, we shall address the validity and relevancy of each of Sportcraft's

sale throughout the United States.") (citing *Nel-*

proposed substantive interrogatories and requests for production.

### Interrogatory 1

Information as to Daido's role in the design or manufacture of the Anderson batting tee is irrelevant to the jurisdictional inquiry. Therefore, Daido need only respond to this interrogatory to the extent it seeks information relating to the sale or distribution of the Anderson batting tee. Additionally, Daido need respond to subsection "d" to the extent that it seeks information about contracts between Daido and other entities besides Sportcraft. Presumably Sportcraft possesses the information relating to its contracts with Daido.

### Interrogatory 3

Similarly, Daido need only respond to sales and distribution aspects of this interrogatory. Additionally, Daido need only respond to subsection "e" to the extent that it seeks information about contracts between Daido and other entities besides Sportcraft. Presumably Sportcraft possesses the information relating to its contracts with Daido.

### Interrogatories 4 through 7

Daido need not respond to these interrogatories because the information sought as to contracts between Daido and Sportcraft is presumably in Sportcraft's possession.

### Interrogatory 8

Interrogatory 8 must be answered because it seeks relevant information pertaining to the volume of Daido's business in Indiana and throughout the United States.

### Interrogatory 9

Interrogatory 9 seeks information that Sportcraft may not know regarding potential indirect business between Daido and Sportcraft, and must be answered.

### Interrogatory 10

This interrogatory must be answered since whether, and to what extent, Daido partici-

*son,* 717 F.2d at 1126–27).

pates in trade shows aimed at selling its products to a multi-state market that includes Indiana is relevant to the jurisdictional inquiry. *See Renner,* 33 F.3d at 283–84.

### Interrogatory 11

Interrogatory 11 shall be limited to Daido's business trips to Indiana.

### Interrogatory 12

Interrogatory 12 seeks relevant information and must be answered.

### Interrogatory 13

The record does not establish the relevancy of the information sought in Interrogatory 13 to the personal jurisdiction inquiry, and therefore Interrogatory 13 need not be answered.

### Interrogatory 14

Although Tsukagoshi's affidavit arguably provides the answers to Interrogatory 14, the information sought is relevant and it must be answered.

### Requests for Production

The scope of the requests for document production appears to mirror the scope of the interrogatories. Such requests for production are unnecessarily duplicative, given Request for Production 1, which seeks production of all documents identified in or relating to Daido's responses to the interrogatories. Therefore, Daido's compliance with Request for Production 1, to the extent it is applicable for its interrogatory responses, will be sufficient to provide Sportcraft with the relevant and meaningful document production as to the limited issue of personal jurisdiction.

### Deposition

At oral argument Daido articulated a strong objection to Sportcraft taking Tsukagoshi's telephone deposition, contending that the information sought would be irrelevant, and that the expense and logistical difficulties inherent in a trans-Pacific telephone deposition would be excessive. However, by supporting its motion to dismiss with Tsukagoshi's affidavit, Daido has held him out to be the company executive who possesses relevant information about Daido's business agreements with Sportcraft. We reiterate that Daido's knowledge or awareness of Sportcraft's distribution system will be the critical issue for the adjudication of the merits of Daido's motion to dismiss, and therefore Sportcraft must be allowed an opportunity to probe Daido's knowledge or awareness through Tsukagoshi. Moreover, courts have recognized that depositions are a particularly apt method for obtaining this sort of information. *See, e.g., Renner,* 33 F.3d at 283 ("When a defendant challenges personal jurisdiction, courts generally permit depositions confined to the issues raised in the motion to dismiss.") (quoting *Wyatt,* 686 F.2d at 283). Therefore, Sportcraft will be permitted to pursue the scheduled telephone deposition of Tsukagoshi, with the admonishment that it be confined and limited to the issue of personal jurisdiction.

## IV. CONCLUSION

Based on the foregoing, it is clear that Sportcraft has met its threshold showing that personal jurisdiction may exist over Daido, despite Daido's repeated protestations that Sportcraft's attempts to obtain jurisdictional discovery is nothing more than a "fishing expedition." As the First Circuit explained over thirty years ago:

> The condemnation of the plaintiff's proposed further activities as a "fishing expedition" was unwarranted. When the fish is identified, and the question is whether it is in the pond, we know no reason to deny a plaintiff the customary license.

*Surpitski v. Hughes–Keenan Corp.,* 362 F.2d 254, 255–56 (1st Cir.1966).

Sportcraft's motion for leave to conduct discovery on the issue of personal jurisdiction is GRANTED.

SO ORDERED.